UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CLIFFORD LEON REID,

                Plaintiff,

v.                                      Case No. 3:14-cv-1408-J-34JRK

R.L. POLK, et al.,

                Defendants.
_____

### ORDER

#### I. Status

Plaintiff Clifford Leon Reid, an inmate of the Florida penal system, initiated this action on November 17, 2014, by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. After several amendments, Reid filed his Fifth Amended Complaint (FAC; Doc. 22) with exhibits (P. Ex.) on January 17, 2017. In the FAC, he names the following individuals as Defendants: (1) R.L. Polk, Assistant Warden and a member of the Institutional Classification Team (ICT); (2) J.A. Parrish, Head of Classification and an ICT member; (3) Laurie L. Owens, an ICT member; (4) Michael L. Willis, Acting Warden at Columbia Correctional Institution (CCI); (5) Monroe Barnes, CCI Warden; and (6) Sergeant Collins. See FAC; Order (Doc. 37); Plaintiff's Response (Doc. 33). He asserts that the Defendants violated his First, Eighth, and Fourteenth Amendment rights when they failed to protect him from harm by other inmates. As relief, he seeks a declaration that the Defendants' actions

violated the laws and Constitution of the United States. <u>See</u> FAC at 22. Additionally, he requests that the Court direct Defendants Polk and Parrish to grant him permanent protective management status, and transfer him to a Y dormitory cell or bunk that is compliant with the Americans with Disabilities Act (ADA). <u>See</u> <u>id.</u> He also seeks compensatory and punitive damages as well as a speedier release from prison. <u>See</u> <u>id.</u> at 23.

This matter is before the Court on Defendants Polk, Parrish, and Willis' Motion to Dismiss (Motion; Doc. 45); Defendant Barnes' Motion to Dismiss (Barnes' Motion; Doc. 58); and Defendant Owens' Motion to Dismiss (Owens' Motion; Doc. 70).[1] The Court advised Reid that granting a motion to dismiss would be an adjudication of the case that could foreclose subsequent litigation on the matter, and gave him an opportunity to respond. <u>See</u> Order (Doc. 23). Plaintiff filed his responses in opposition to the motions. <u>See</u> Response in Opposition to Defendants' Motion to Dismiss (Response; Doc. 55); Response in Opposition to Defendant Barnes' Motion to Dismiss (Doc. 63); Response in Opposition to Defendant Owens' Motion to Dismiss (Doc. 71). Defendants' motions are ripe for review.

## II. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. <u>Ashcroft v.</u>

---

[1] The Court has not served Defendant Collins because Reid is unable to provide sufficient information for service of process. <u>See</u> Order (Doc. 68); Response (Doc. 67).

Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534
U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med.
Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all
reasonable inferences should be drawn in favor of the plaintiff.
See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir.
2003) (per curiam). Nonetheless, the plaintiff must still meet some
minimal pleading requirements. Jackson v. BellSouth Telecomm., 372
F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed,
while "[s]pecific facts are not necessary[,]" the complaint should
"'give the defendant fair notice of what the . . . claim is and the
grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93
(2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.
544, 555 (2007)). Further, the plaintiff must allege "enough facts
to state a claim that is plausible on its face." Twombly, 550 U.S.
at 570. "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged."
Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556); see
Miljkovic v. Shafritz & Dinkin, P.A., 791 F.3d 1291, 1297 (11th
Cir. 2015) (citation and footnote omitted). A "plaintiff's
obligation to provide the grounds of his entitlement to relief
requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do[.]"
Twombly, 550 U.S. at 555 (internal quotations omitted); see also

3

<u>Jackson</u>, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." <u>Iqbal</u>, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).

The Eleventh Circuit has stated:

> To survive a motion to dismiss, [plaintiff]'s complaint must have set out facts sufficient to "raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). This means he must have alleged "factual content that allow[ed] the court to draw the reasonable inference that the defendant[s] [were] liable for the misconduct." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). The allegations must be plausible, but plausibility is not probability. <u>See</u> <u>id.</u>

<u>Lane v. Philbin</u>, 835 F.3d 1302, 1305 (11th Cir. 2016).

## III. Fifth Amended Complaint[2]

Reid asserts that the Defendants failed to protect him from harm and acted with "personal malicious hostility" towards him from the time he arrived at CCI in early March 2011 through September 2012. FAC at 14. He states the Defendants

> knowingly and intentionally "used" said state facility with motive and aim of causing Reid's instant death[.] These Defendants regularly refused to provide Reid adequate safety and regularly refused to protect Reid from the predatory group of inmates (gang members and convicted murderers) being housed in B-dormitory and it was this use of said institution that directly gave rise to inmate Hawk's said kicking attack, inmate Otis Williams' said death threat and inmate Cheatham's May 31, 2012 unprovoked and unwant[ed] life jeopardizing kicking attack against Reid . . . .

Id. He asserts that the Defendants made "adverse decisions" when they refused to protect him from the physical violence and threats on the part of the convicted murderers and gang members housed in B dormitory. Id. at 18.

---

[2] The FAC is the operative pleading. In considering a motion to dismiss, the Court must accept all factual allegations in the FAC as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Miljkovic v. Shafritz and Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015) (quotations and citations omitted). As such, the recited facts are drawn from the FAC and may differ from those that ultimately can be proved. Additionally, because this matter is before the Court on motions to dismiss filed by Polk, Parrish, Willis, Barnes, and Owens, the Court's recitation of the facts will focus on Reid's allegations as to these Defendants.

Reid, who is wheelchair-bound, asserts that on April 18, 2011, inmate Hawk, who was sitting in a wheelchair, kicked Reid's legs. See id. at 6-7. According to Reid, Hawk was purposely blocking the exit from the B dormitory television room, so Reid asked Hawk twice to let him pass. See id. at 7. Reid states that when Hawk neither responded nor moved, he "tapped on the handle" of Hawk's wheelchair and repeated his request to pass. Id. He avers that Hawk then spun to face Reid, called Reid "a bitch," and launched into kicking Reid's legs several times. Id. Reid maintains that Hawk's unprovoked "kicking attack" caused "serious physical injuries" to his legs, hips, lower back, and neck, worsened his pre-existing spinal and neck injuries, and resulted in pain lasting more than nine weeks. Id. at 8, 9. Reid complains that corrections officers handcuffed and escorted him to confinement without addressing his injuries, but took no corrective action against Hawk. Id. at 8.

According to Reid, a few days later, he requested permanent housing in Y dormitory, an isolated protective management dormitory at CCI. See id. at 9. He states that the ICT (Defendants Polk, Parrish, and Owens) interviewed him about the circumstances giving rise to his encounter with Hawk and inquired as to why he wanted protection and Y dormitory housing. See id. at 9-10. Reid explained that he needed Y dormitory housing because gang members and convicted murderers in B dormitory knew he had committed a sexual crime against a young child, and therefore, his life was in danger.

See id. at 10. Reid avers that he informed the ICT that he believed Hawk would eventually kill him because Hawk had "the total support" of the gang members, convicted murderers, and open population B dormitory security staff who called Reid a "baby raper" and "chomo."[3] Id. at 10-11. Reid states that Defendant Parrish told him staff denied his request for protection and would return him back to open population because the Florida Department of Corrections (FDOC) had transferred Hawk. See id. at 11.

On April 18, 2011, Reid submitted a grievance to CCI security staff complaining about Hawk. See id. at 16; P. Ex. 1. He stated in pertinent part:

> On 4-18-11 at B dorm wing 2 and in the day room I was dangerously and violently physically attac[k]ed by a psychopathic Negro inmate who sleeps in bunk B-2157s. He's an abled [sic] body inmate who is still allowed a wheelchair. Said inmate attacked me with such physical strength and force as to completely paralyze me or murder me. He kicked (see attachment 2 of 2) my legs and my wheelchair several times, physically injurying [sic] me with leg injuries and neck injuries (i.e. he snapped my neck, my head came forward with such force it caused my neck to jerk as my wheelchair flew backward while said inmate was kicking me (while I was seated in my wheelchair) and my wheelchair[.] This happen[ed] after I returned from lunch. This inmate['s] intent to inflict upon me either of the said known pervasive risk of harm (complete paralyzation or an unconstitutional death) that [is] well known to the Department and to Columbia's medical department; this

---

[3] Chomo is a jailhouse term for a child molester. See https://www.urbandictionary.com.

said inmate has no regards for any human life
and has threatened to use the iron removable
leg rest of his wheelchair the next time he
assaults me and I fear that said assault is
imminent.

I'm a fall risk, assault risk wheelchair
bound terminally ill inmate who is pervasively
known by the Department and its medical
department to be a member of an identifiable
group of inmates (i.e. weak, vulnerable,
powerless inmates who were convicted of
sexually abusing a young child) who are
frequently targeted by dangerous and violently
aggressive prison staff and other inmates who
are murderers, gang members, drug dealers,
kidnappers, homosexuals with malice
aforethought state of minds . . . .

I'm respectfully requesting security to
take know[n] reasonable step[s] to protect me
and immediately reduce said imminent assault
upon me by said inmate who sleeps in bunk B-
2157s and that said inmate [is] punished for
the assault he has already committed upon me
on 4-18-11. . . .

P. Ex. 1 at 1-2 (selected parentheses omitted). The FDOC denied the

grievance on April 30, 2011, and stated: "you have been placed into

administrative confinement status pending [a] protection

investigation." Id. at 1. On May 25, 2011,[4] Reid submitted a

request for administrative remedy or appeal to the Warden, stating

in pertinent part:

The Department, through various Warden[s] has
observe[d] a custom of gross negligence and
deliberate indifference to my safety needs
since 3/19/08 till [sic] the date of the
filing of this formal grievance (i.e. I've

---

[4] Reid asserts that he received the FDOC's response to his
informal grievance on May 23, 2011. See FAC at 16; P. Ex. 1.

> made more than 10 request[s] for protection
> from dangerously violent psychotic gang
> members and murderers which I reported and
> requested of various security staffs and
> wardens and said has resulted in my being
> house[d] in B-Dorm among said inmates who are
> a known pervasive risk of serious harm (i.e.
> complete paral[y]zation or death) constantly
> and it has resulted in my being dangerously
> physically assault[ed] by such a[n] inmate,
> again, on 4/18/11 . . . .

P. Ex. 2 at 1. On June 7, 2011, Defendant Willis responded in pertinent part:

> Your request for administrative remedy or
> appeal has been received and reviewed. It
> appears that your last request for protection
> was denied, as well as your appeal to
> Tallahassee. If you are in fear for your
> safety you may inform any staff member. There
> will be no mon[e]tary reimbursement. Based on
> the foregoing, your request for administrative
> remedy is denied.

Id. at 2. On June 17, 2011, Reid submitted a request for administrative remedy or appeal to the FDOC Secretary. See FAC at 17; P. Ex. 3. He asserted that the security staff informed "known dangerous murderers, drug dealers, and gang members" that he was convicted of a sexual offense involving a child to create "a known constant pervasive risk of serious harm" and housed him in the same dormitory with the "informed inmates." P. Ex. 3. On June 23, 2011, Reid submitted an informal grievance to the Assistant Warden and complained about Hawk ("a convicted murderer") attacking him in B dormitory. P. Ex. 4 at 1. The classification department denied the grievance on June 27th, and stated in pertinent part:

> You are currently serving a life sentence and
> at the institutional level [we] cannot process
> your request. You may request a good
> adjustment transfer if you would like to be
> close to your family.

Id. Notably, Reid does not assert that he had any contact or
interaction with Hawk following the April 18, 2011 incident.

With respect to the second alleged incident, Reid avers that,
on April 25, 2011, inmate Otis Williams woke him, demanded that
Reid roll over, and told Reid that he "was making noise." FAC at
12. According to Reid, Williams warned Reid that he would not wake
him the next time, but instead would "flip" Reid and his bunk and
beat Reid with his cane. Id. Reid states that he feared Williams
would kill him if he stayed in B dormitory, and therefore reported
the incident to a security officer that same day. See id. at 12-13.
He asserts that, on April 30, 2011, the ICT conducted an interview,
at which Reid described Williams' threat, maintained that Williams
was "motivated" to kill him because of his sexual battery
conviction, and explained that numerous gang members, convicted
murderers, and corrections officers were "aiming to cause [his]
instant death." Id. at 13. According to Reid, Defendants refused to
protect him, and returned him to B dormitory, just a few bunks over
from Williams. See id. Reid does not assert that Williams has
harmed him in any way.

Reid complained about Williams' alleged threat by using the
prison's administrative grievance procedure. On June 13, 2011, he

10

submitted a request for administrative remedy or appeal to the Warden. See P. Ex. 5. In the grievance, he requested protection from inmate Williams and the "victimization" in B dormitory. Id. On June 20th, the FDOC responded in pertinent part:

> Your request for administrative remedy or appeal has been received and reviewed. You were previously placed into protection status due to your allegations against inmate Williams, but you were denied PM [(protective management)] status because a threat could not be confirmed and it was felt . . . that you just wanted single cell housing. You have not demonstrated additional threats towards you, only that you fear a dangerous situation could present itself due to the types of inmates that you are housed with. If you again fear for your safety[,] speak to a staff member with your concerns. At this time you have not demonstrated that you have been victimized. Based on the foregoing, your request for administrative remedy is denied.

Id. at 5; see FAC at 20.

On June 25, 2011, Reid submitted a request for administrative remedy or appeal to the FDOC Secretary and asserted that inmates (Henderson in 2007, and Hawk and Williams in 2011), corrections officers, and medical staff have assaulted him since 1994. See P. Ex. 6. On July 5, 2011, he submitted a request for administrative remedy or appeal to the Warden and complained that "the class of dangerous inmates" (convicted murderers and gang members) victimized him, and therefore, rehabilitation was unlikely. P. Ex. 7. On July 21st, the FDOC stated in pertinent part:

> Your request for administrative remedy has been received, reviewed and evaluated.

Log # 1107-201-091

> In one long run-on sentence you seem to be
> making an inane argument to either be
> transferred to another institution or to be
> released from the custody of the Florida
> Department of Corrections. Your formal
> grievance is denied.

Id. at 7. On August 1, 2011, he submitted a request for
administrative remedy or appeal to the FDOC Secretary. See P. Ex.
8. In the grievance, he complained about the convicted murderers
and gang members and requested that the FDOC remove the "barriers"
that could prevent his successful return to society and accordingly
not incarcerate him in any prison or correctional institution. Id.
at 2.

With regard to the third alleged attack, Reid asserts that
inmate Cheatham, a convicted murderer, kicked Reid's right leg and
threatened him on May 31, 2012. See FAC at 14. Reid refers to his
exhibits, in which he recited the alleged facts relating to
Cheatham's assault and complained about the convicted murderers and
gang members in B dormitory. See id. (citing P. Exs. 10; 11; 12;
13); see also P. Ex. 9. In his June 12, 2012 grievance to the
Warden, Reid complained about the FDOC's failure to develop an
adequate system of due process for his safety needs. See P. Ex. 11.
On June 21st, Defendant Polk responded, in pertinent part:

> Your request for administrative remedy has
> been received, reviewed and evaluated.
>
> Log # 1206-201-135[.]

> A Process is already implemented for those
> inmates that are in fear that they might be in
> danger. That is the objective of the
> protection needs process, if you feel that you
> are in fear of you[r] life you can request
> protection, and your claims for protection
> will be investigated.

P. Ex. 11 at 3.

## IV. Summary of the Arguments

Reid asserts that the Defendants violated his First, Eighth, and Fourteenth Amendment rights when they failed to protect him from harm by other inmates. In the motions to dismiss, Defendants Polk, Parrish, Willis, Barnes, and Owens assert that Reid's claims against them should be dismissed because: (1) Reid failed to state Eighth Amendment and Fourteenth Amendment claims;[5] (2) Willis, Barnes, and Owens, as supervisory officials, are not liable under 42 U.S.C. § 1983; (3) they are entitled to qualified immunity; (4) Reid's requests for declaratory and injunctive relief are moot and/or without merit; and (5) he may not sue the Defendants in their individual capacities for compensatory and punitive damages absent a physical injury that is more than de minimis. In response, Reid asserts that he has stated plausible claims upon which relief may be granted, and that Defendants' motions should be denied.

---

[5] Notably, the Defendants do not address Reid's First Amendment retaliation claim.

13

## V. Law and Conclusions

### A. Eighth Amendment Failure to Protect

Reid asserts that Defendants Polk, Parrish, Willis, Barnes, and Owens violated his Eighth Amendment right to be free from cruel and unusual punishment. He bases this claim on his contention that these Defendants failed to take reasonable steps to protect him from known dangers (convicted murderers and gang members who targeted him due to his child sexual battery conviction). He further asserts that this failure constitutes deliberate indifference to his safety needs, and resulted in inmates Hawk and Cheatham assaulting him, and inmate Williams threatening him with physical violence. Reid describes inmates Hawk, Williams, and Cheatham as convicted murderers who are housed in B dormitory. See P. Exs. 4 at 1, 2; 5 at 1; 6 at 2; 13. Reid states that unidentified "hardcore" prisoners spread information of his child sexual battery conviction to the gang members and convicted murderers, subjecting him to "a substantial risk of constant threats of violence" for two to three weeks before his April 18, 2011 encounter with Hawk, and thereafter. FAC at 10, 19, 21. He maintains that "more than 140 dangerous extremely maladjusted, unmanageable, heartless gang members and convicted murderers were housed in B-dorm" and "posed" a risk to his life, but nevertheless, the FDOC assigned him to B dormitory and never provided protective management housing. Id. at 19.

Defendants seek dismissal of Reid's Eighth Amendment claims against them, arguing that Reid fails to provide sufficient facts that would entitle him to relief. They assert that Reid has shown neither that a substantial risk of serious harm existed, nor that they drew the inference that a substantial risk of serious harm existed. <u>See</u> Motion at 12-13; Barnes' Motion at 13; Owens' Motion at 13-14. They further assert that Reid has failed to show that their conduct amounted to more than gross negligence. <u>See</u> <u>id.</u> Defendants maintain that they were not deliberately indifferent to Reid's safety needs because they investigated Reid's assertions, and advised him that the FDOC transferred Hawk to another facility and that they could not confirm Reid's assertions concerning threats by other inmates. <u>See</u> Motion at 13; Barnes' Motion at 13-14; Owens' Motion at 14. In response to the motions to dismiss, Reid asserts that he states plausible Eighth Amendment claims against the Defendants, and therefore, their motions to dismiss should be denied.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." <u>Farmer</u> <u>v. Brennan</u>, 511 U.S. 825, 832 (1994) (citations omitted). However, prison officials are not constitutionally liable for every inmate-on-inmate attack. <u>Id.</u> at 834. Instead, a prison official violates the Eighth Amendment "when a substantial risk of serious harm, <u>of</u> <u>which the official is subjectively aware</u>, exists and the official

does not respond reasonably to the risk." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (quotation marks omitted and emphasis added). It is the prison officials' deliberate indifference to that known substantial risk of harm that rises to the level of an Eighth Amendment violation. See Farmer, 511 U.S. at 829. Mere negligence is not sufficient. See id. at 835-36.

The Eleventh Circuit addressed the requirements of an Eighth Amendment violation in Caldwell v. Warden, FCI Talladega, 748 F.3d 1090 (11th Cir. 2014).

> When examining the first element—a substantial risk of serious harm—the court uses an objective standard. See Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1028–29 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm." Rodriguez,[6] 508 F.3d at 617 (citing Farmer, 511 U.S. at 829, 837, 844, 114 S.Ct. at 1974, 1979, 1982-83, and other cases) (footnote omitted). To satisfy the objective component, a plaintiff must produce evidence that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." Id.
>
> With regard to the subjective component of the second element—i.e., the defendant's actual knowledge that an inmate faced a

---

[6] Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007).

> substantial risk of serious harm—the defendant
> "must both be aware of facts from which the
> inference could be drawn that a substantial
> risk of serious harm exists, and he must also
> draw the inference." <u>Farmer</u>, 511 U.S. at 837,
> 114 S.Ct. at 1979. "Whether a prison official
> had the requisite knowledge of a substantial
> risk is a question of fact subject to
> demonstration in the usual ways, including
> inference from circumstantial evidence."
> <u>Rodriquez</u>, 508 F.3d at 617 (quoting <u>Farmer</u>,
> 511 U.S. at 842, 114 S.Ct. at 1981) (quotation
> marks omitted).

<u>Id.</u> at 1099-1100; <u>see also</u> <u>Losey v. Thompson</u>, 596 F. App'x 783, 788-89 (11th Cir. 2015).

Thus, to establish an Eighth Amendment violation, an inmate must show that a prison official "actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." <u>Rodriquez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 617 (11th Cir. 2007) (citing <u>Farmer</u>, 511 U.S. at 837, 844) (footnote omitted). The Eleventh Circuit has observed that "[t]he known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a guard's failure to act can constitute deliberate indifference." <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990). A prison official may avoid Eighth Amendment liability for failure to protect an inmate in one of three ways: (1) showing that the official was not aware "of the underlying facts indicating a sufficiently substantial danger" and that he was "therefore unaware of a danger"; (2) admitting

awareness of "the underlying facts" of a substantial danger, but believing the danger "was insubstantial or nonexistent"; or (3) showing he "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted." Rodriquez, 508 F.3d at 617-18 (quoting Farmer, 511 U.S. at 844) (internal quotations omitted).

The Eleventh Circuit has recognized that "'threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.'" Woodyard v. Ala. Dep't of Corr., 700 F. App'x 927, 933 (11th Cir. 2017) (quoting Prater v. Dahm, 89 F.3d 538, 542 (8th Cir. 1996)). Notably, where a plaintiff presents evidence that he reported only a vague, generalized fear or problems with other inmates rather than a specific and particularized threat of harm, courts have not hesitated to find the plaintiff's claims insufficient as a matter of law. See, e.g., Carter, 352 F.3d at 1349-50; McBride v. Rivers, 170 F. App'x 648, 655 (11th Cir. 2006) (per curiam). For example, in Carter, the plaintiff submitted evidence that prison officials knew the inmate who later attacked him was a "problem inmate" and was roaming the cell he shared with plaintiff like a "caged animal." 352 F.3d at 1349. He further presented evidence that he told prison officials that the inmate was "acting crazy," that the inmate intended to "fake a hanging," and that the inmate told the plaintiff that he (the plaintiff) would help fake the hanging "one

18

way or another." Id. The Carter court found these circumstances to be insufficient to create a genuine issue of fact on the question of whether the defendant prison officials were actually, subjectively aware of a substantial risk of serious harm to the plaintiff. Id. at 1349-50. In doing so, the court noted that there was no evidence that the plaintiff explicitly told the prison officials that he feared his cellmate or that his cellmate had clearly threatened him. Id. at 1349. The court also found that the cellmate's statement that the plaintiff would help him fake a hanging required an inappropriate "inferential leap" in order for the prison officials to interpret the statement as a threat to the plaintiff. Id. at 1350. Lastly, the court noted that the plaintiff never told prison officials that he considered the inmate's statements to be a threat. Id. At most, the court said, the prison officials were negligent by failing to separate the inmates, but such was insufficient to justify liability under § 1983. Id.; see also Estate of Owens v. GEO Grp., Inc., 660 F. App'x 763, 770 (11th Cir. 2016) (per curiam) (finding no evidence that the prison official "had any belief, suspicion, knowledge, or inclination that [the inmate] would attack when he did" or that the inmate posed any "particularized threat" to the plaintiff).

In McBride, the court affirmed the entry of summary judgment in favor of prison officials, despite the fact that the plaintiff presented evidence that he specifically asked not to be placed in

a cell with the inmate who later attacked him. 170 F. App'x at 655. According to the record, the plaintiff reported telling a prison guard, "me and that dude had problems. I'm in fear for my life. Don't put me in the cell with him." Id. The court found this evidence to be insufficient as a matter of law on the question of whether the prison officials were subjectively aware of a serious risk of harm. In reaching that conclusion, the court found the facts to be similar to those in Carter, and noted that the plaintiff "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed." Id.

In contrast, where a plaintiff presents evidence of a more particularized threat, a jury question will exist. See Caldwell, 748 F.3d at 1093-94, 1100-01; see also Rodriquez, 508 F.3d at 620-22. In Caldwell, prison officials had ample knowledge of the specific aggressor inmate, Pinson's, violent past. See Caldwell, 748 F.3d at 1093. They were aware that Pinson warned that he did not want a cellmate, see id. at 1093-94, and that Pinson intentionally started a fire in the cell while he and Caldwell were locked in it, see id. at 1094. Also, Caldwell told prison officials that he was "in fear for his life" if returned to the cell with Pinson. See id. Nevertheless, within hours of the fire, and without any investigation or precautions for Caldwell's safety, the defendants returned Caldwell to the cell with Pinson who violently attacked him the next morning. See id. Citing Carter, the Court

stressed that Caldwell was required to show "more than 'a generalized awareness of risk'" or the mere awareness of a particular inmate's "'generally problematic nature.'" Id. at 1101-02 (citing Carter, 352 F.3d at 1349-50). Based on the facts recited above, the Court determined Caldwell had done so. Id. at 1102.

The Eleventh Circuit's decision in Rodriguez is also instructive here because it involved a gang threat and provides an example of a threat report sufficiently specific to create a jury question. See 508 F.3d at 620-22. In Rodriguez, the court, recounting the facts in the light most favorable to the plaintiff and construing all reasonable inferences in his favor, summarized that the plaintiff reported to two prison guards on at least two occasions that he wanted to be transferred because Latin Kings gang members "wanted to kill [him]" as retribution after he renounced his affiliation with the gang. Id. at 613-16. The plaintiff was stabbed only hours after he was released back to the general population, a decision made at a classification review meeting in which the defendants participated and after the plaintiff had again requested to be transferred. Id. at 615-16. As to the subjective knowledge inquiry, one defendant, in a motion for summary judgment, denied any knowledge of the reports. Id. at 619. The other defendant, however, in a motion for directed verdict at trial, acknowledged the plaintiff reported a threat, but, relying on Carter, argued the threat was too vague. Id. at 621. The court

rejected that defendant's reliance on <u>Carter</u>, finding that the plaintiff's reported threat was more specific than that of the <u>Carter</u> plaintiff's. <u>Id.</u> at 621-22. In doing so, the court determined that a jury could find that the plaintiff reported the following:

> (1) that he was a former Latin King who decided to renounce his membership; (2) that members of the Latin Kings had threatened to kill him when he returned to the compound in retaliation for his renunciation; (3) that the compound at [the correctional facility] was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt on his life, he needed either to be transferred to another institution or to be placed in protective custody. These are things that the inmate in <u>Carter</u> did not do.

<u>Id.</u> at 621.

These cases, while decided at summary judgment, provide guidance on the issue of the sufficiency of an inmate's allegations of a purported threat to support even an inference of subjective knowledge of a substantial risk of harm on the part of a defendant prison official. Turning to Reid's claims, the Court must accept Reid's allegations as true at this stage of the proceedings, and construe all reasonable inferences in his favor. Doing so, the Court must determine whether Reid's statements were sufficiently specific to impute to the Defendants knowledge of a substantial risk of serious harm to him. After careful review, the Court concludes that Reid's reported "threats," like that in <u>Carter</u>, fail to reach the specificity required to support even an inference of

actual knowledge on the part of Polk, Parrish, Willis, Barnes, and Owens of a substantial risk of serious harm to Reid.

According to Reid, he feared B dormitory's "predatory group of inmates (gang members and convicted murderers)." FAC at 14. He asserts that Defendants' failure to protect him from "the predatory group" ultimately led to Hawk and Cheatham's kicking attacks and Williams' threat. <u>See</u> <u>id.</u> Even accepting Reid's allegations as true, Reid's reports to Polk, Parrish, Willis, Barnes, and Owens amount to no more than statements of generalized fear of the "more than 140"[7] convicted murderers and gang members housed in B dormitory who could potentially harm him because they knew about his child sexual battery conviction and had referred to him as a chomo and baby raper. These allegations suggest no more than the type of generalized risk found insufficient in <u>Carter</u>.

Preliminarily, the Court notes that nothing in Reid's allegations supports an inference that the Defendants had knowledge of any particular disciplinary issues or problems with Hawk, Cheatham, or Williams prior to their interactions with Reid. With respect to Williams, although Reid asserts that Williams threatened to flip his bunk, he never suggests that he reported this specific threat to prison officials, nor does he assert that Williams ever assaulted him in any way. As to Hawk and Cheatham, Reid neither asserts that he reported any threat made by Hawk or Cheatham nor

---

[7] FAC at 19.

that he had any problems with either Hawk or Cheatham prior to the kicking incidents. Reid also fails to allege any specific facts from which Defendants could have drawn an inference that Hawk or Cheatham posed a substantial risk of harm to Reid. See Carter, 352 F.3d at 1349 ("[B]efore Defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of Inmate Barnes's generally problematic nature.").[8] Critically, Reid never alleges that he reported that any inmate actually threatened him or posed a specific threat to him. Instead, he reported a generalized fear about his safety, given his offense of conviction and B dormitory's predatory group of inmates. Reid's claimed threat is demonstrably less specific than the ones reported by the plaintiffs in either Caldwell or Rodriquez, and even less specific than the Carter plaintiff's reported threat. Caldwell, 748 F.3d at 1093-94, 1100-01; Rodriquez, 508 F.3d at 621; Carter, 352 F.3d at 1349.

Notably, the Rodriquez plaintiff articulated a threat of harm to him, in particular, rather than a generalized threat or derogatory statements about a particular class of people. He reported that gang members "wanted to kill [him]," and he

---

[8] Unlike the Carter plaintiff who was locked in a cell with his attacker for hours every night without direct supervision, Reid was in an open population setting. See Owens, 660 F. App'x at 771. Hawk kicked Reid as Reid exited the television room, and Cheatham kicked Reid as Reid left the chow hall. Williams threatened Reid, but Reid never asserts that Williams physically assaulted him.

referenced a specific, articulable event that caused this fear—renouncing his affiliation with the gang and a specific gang population. <u>Id.</u> at 614. Reid reported no such threat, and his allegation that B dormitory is full of convicted murderers and gang members does not save his claim.

While the gang population was important in <u>Rodriguez</u>, the Court does not read <u>Rodriguez</u> to suggest that all inmate reports of gang-related threats result in a heightened duty for prison officials to act in the absence of a specific threat report based on an articulable risk of harm. <u>See</u> <u>id.</u> at 621–22. Rather, the <u>Rodriguez</u> court's discussion of gang involvement related to the specific facts the plaintiff had reported in that case. Indeed, the <u>Rodriguez</u> court observed that, "<u>[i]n the context of this case</u>, we conclude that the gang-related threats made on [plaintiff's] life, which were <u>explicitly reported</u> to prison officials, present a substantial enough risk of harm to trigger a prison official's Eighth Amendment duty to act." <u>Id.</u> at 617 n.12 (emphasis added). As such, what the <u>Rodriguez</u> court held was that the plaintiff's reports of his former gang involvement and later renunciation, in that case, provided the necessary specificity required to create an issue of fact for a jury's determination. <u>See</u> <u>id.</u> at 620–22.

Here, unlike in <u>Rodriguez</u>, Reid does not allege either that he reported to Polk, Parrish, Willis, Barnes, and Owens a specific threat of physical harm or death made against him, in particular by

gang members, or that any of the Defendants was aware of any fact from which he could have drawn an inference that Reid in particular faced a substantial risk of serious harm, much less any fact suggesting that any Defendant actually drew such an inference and disregarded it. Reid's vague, generalized fear of the convicted murderers and gang members housed in B dormitory rather than a specific and particularized threat of harm by either a specific inmate, cellmate, or group of inmates is simply insufficient to state a plausible claim under the Eighth Amendment for failure to protect him. See Carter, 352 F.3d at 1349-50; McBride, 170 F. App'x at 655.

As stated in Farmer, a defendant "must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also 'draw that inference.'" 511 U.S. at 837. Reid's allegations provide no basis to impute to Polk, Parrish, Willis, Barnes, and Owens actual knowledge of a particularized threat of harm. Indeed, his vague reports of generalized fear about B dormitory's large predatory group of convicted murderers and gang members' desire to harm him due to his sexual battery conviction are insufficient to support even an inference that the Defendants were actually aware of a substantial risk of harm to Reid. See Carter, 352 F.3d at 1350 ("Defendants would have had to read imaginatively all derogatory and argumentative statements made between prisoners to determine

whether substantial risks of serious harm exist."). Reid has failed to plead "factual content that allows the court to draw the reasonable inference that [the Defendants are] liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Thus, he fails to state a claim plausible on its face. <u>Id.</u>

Here, at most, Reid's report of the predatory group's name calling and threats can be interpreted as a general expression of disapproval and hatred toward inmates convicted of sexual battery involving children. Defendants' failure to act on this complaint would amount, at most, to mere negligence and not deliberate indifference to a known substantial risk of harm. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Bowen v. Warden, Baldwin State Prison</u>, 826 F.3d 1312, 1321 (11th Cir. 2016) ("[I]t is only a heightened degree of culpability that will satisfy the subjective knowledge component of the deliberate indifference standard, a requirement that is 'far more onerous than normal tort-based standards of conduct sounding in negligence.'"). Upon review of the record, viewing the facts in the light most favorable to Reid and drawing reasonable inferences in his favor, as the Court must, the Court finds that Reid has not alleged facts sufficient to state a plausible claim under the Eighth Amendment. As such, Defendants' motions to dismiss are due to be granted as to Reid's Eighth Amendment claims against them.

## B. Fourteenth Amendment Due Process

Reid asserts that the Defendants violated his Fourteenth Amendment right to due process of law and his right to protection and rehabilitation under Florida Statutes sections 20.315(1)(d), (2)(a), when they denied his requests for protection and permitted him to be victimized in open population. See FAC at 15; P. Exs. 4 at 2-4; 6 at 4; 7; 10 at 2; 11 at 2. Florida Statutes section 20.315 states, in pertinent part:

> (1) Purpose.--The purpose of the Department of Corrections is to protect the public through the incarceration and supervision of offenders and to rehabilitate offenders through the application of work, programs, and services. The goals of the department shall be:
>
> . . . .
>
> (d) To provide a safe and humane environment for offenders and staff in which rehabilitation is possible. This should include the protection of the offender from victimization within the institution and the development of a system of due process, where applicable.
>
> . . . .
>
> (2) Legislative intent.--It is the intent of the Legislature that:
>
> (a) The department focus its attention on the removal of barriers that could prevent the inmate's successful return to society while supervising and incarcerating offenders at a level of security commensurate with the danger they present to the public.

Florida Statutes sections 20.315(1)(d), (2)(a). Defendants maintain that Reid's Fourteenth Amendment claims against them should be

dismissed because FDOC staff afforded him due process through the prison's grievance system. See Motion at 17-19; Barnes' Motion at 16-18; Owens' Motion at 17-19.

Indeed, Reid's allegations affirmatively reflect that he had an opportunity to avail himself of the prison grievance system and did so. To the extent Reid asserts a due process claim for Defendants' allegedly interfering with his grievances, he has failed to state a claim because a prisoner has no constitutionally-protected liberty interest in accessing a prison's grievance procedure. Bingham v. Thomas, 654 F.3d 1171, 1177 (11th Cir. 2011) (per curiam). Moreover, to the extent Reid asserts that Defendants failed to respond appropriately to his grievances, such a due process claim under 42 U.S.C. § 1983 fails. See Moore v. McLaughlin, 569 F. App'x 656, 659 (11th Cir. 2014) (holding that a prisoner has no constitutionally protected liberty interest in access to prison's grievance procedure, and thus, could not base a § 1983 claim on a prison official's alleged failure to respond appropriately to his grievances).

Reid apparently believes that the FDOC's procedures for review of an inmate's request for protective management are inadequate in that he asserts in pertinent part:

> I'm requesting that known reasonable
> step[s] be taken immediately to develop and
> immediately implement a system of due process
> which immediately corrects all of the
> aforementioned unlawful and dangerous
> situation I'm known to be faced with at this

> institution and throughout the Department of
> Corrections since April of 2007, the absence
> of which has deprived me of said liberty
> interest by permitting the wantonous and
> sadistic infliction of unwant[ed] punishment
> against (i.e. cruel and unusual punishment) at
> the murderous and inhuman[e] hands mind and
> physical presence of said inmate on May 31,
> 2012. . . . which has violated the intent of
> the Florida Legislature (i.e. the full
> magnitude of my said issue present herein) as
> set forth in § 20.315(1)(d)(i)(2)(a) (2011)
> F.S. . . .

P. Ex. 11 at 2; <u>see</u> P. Exs. 4 at 4; 10. In response, Reid's FAC

reflects that the FDOC advised him that a "[p]rocess is already

implemented for those inmates that are in fear that they might be

in danger." <u>Id.</u> at 11 at 3. Reid acknowledges that the FDOC

reviewed his requests for protective management housing,

investigated his assertions, placed him in a protective status

until completion of the investigation, notified him that Hawk had

been transferred to another facility, and advised him that staff

could not verify his complaint about Williams. <u>See</u> FAC at 11, 20;

P. Exs. 1 at 1; 5 at 5; 11 at 3. Upon review, despite viewing the

facts in the light most favorable to Reid and drawing reasonable

inferences in his favor, the Court concludes that Reid has not

alleged facts sufficient to state a plausible claim under either

the Fourteenth Amendment or Florida law. As such, Defendants'

motions to dismiss are due to be granted as to Reid's Fourteenth

Amendment claims against them.

## C. Qualified Immunity

Defendants assert that they are entitled to qualified immunity. See Motion 11-12; Barnes' Motion at 11-12; Owens' Motion at 11-12. Under the doctrine of qualified immunity, a defendant may claim he is entitled to qualified immunity from monetary damages in his individual capacity. The "Twombly-Iqbal plausibility standard" applies equally to "[p]leadings for § 1983 cases involving defendants who are able to assert qualified immunity as a defense." Randall v. Scott, 610 F.3d 701, 707 n. 2, 709 (11th Cir. 2010); see also Hoefling v. City of Miami, 811 F.3d 1271, 1276 (11th Cir. 2016) (reaffirming holding of Randall). As to qualified immunity, the Eleventh Circuit has stated:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

> As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one

31

who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. <u>See</u> <u>id</u>. To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), <u>overruled in part on other grounds</u> by <u>Pearson</u>, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings. <u>Maddox</u>, 727 F.3d at 1120-21 (citation omitted).

<u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017).

Here, when Defendants were alleged to have engaged in the challenged actions, they were on duty as FDOC employees performing corrections and administrative duties. Because they were acting within the scope of their discretionary authority, the burden shifts to Reid to demonstrate that Defendants are not entitled to qualified immunity. To defeat qualified immunity, Reid must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendants violated his constitutional right and that the right was clearly established at the time of Defendants' actions. Recently, the Eleventh Circuit explained:

> To be clearly established, a right must be well-established enough "that every reasonable official would have understood that what he is doing violates that right." <u>Reichle v. Howards</u>, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (internal quotation marks omitted and alteration adopted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus given the official fair warning that his conduct violated the law. <u>Id.</u> (emphasis added); <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("The critical inquiry is whether the law provided [Defendant officers] with 'fair warning' that their conduct violated the [constitutional right].").

> Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. <u>See</u> <u>Terrell v. Smith</u>, 668 F.3d 1244, 1255 (11th Cir. 2012). However, a judicial precedent with identical facts is not essential for the law to be clearly established. <u>Youmans v. Gagnon</u>, 626 F.3d 557,

> 563 (11th Cir. 2010). Authoritative judicial
> decisions may "establish broad principles of
> law" that are clearly applicable to the
> conduct at issue. <u>Griffin Indus., Inc. v.
> Irvin</u>, 496 F.3d 1189, 1209 (11th Cir. 2007).
> And occasionally, albeit not very often, it
> may be obvious from "explicit statutory or
> constitutional statements" that conduct is
> unconstitutional. <u>Id.</u> at 1208-09. In all of
> these circumstances, qualified immunity will
> be denied only if the preexisting law by case
> law or otherwise "make[s] it obvious that the
> defendant's acts violated the plaintiff's
> rights in the specific set of circumstances at
> issue." <u>Youmans</u>, 626 F.3d at 563.

<u>Gates v. Khokhar</u>, No. 16-15118, 2018 WL 1277395, at *3 (11th Cir.

Mar. 13, 2018); <u>see</u> <u>Maddox v. Stephens</u>, 727 F.3d 1109 (11th Cir.

2013) ("A right may be clearly established for qualified immunity

purposes in one of three ways: '(1) case law with indistinguishable

facts clearly establishing the constitutional right; (2) a broad

statement of principle within the Constitution, statute, or case

law that clearly establishes a constitutional right; or (3) conduct

so egregious that a constitutional right was clearly violated, even

in the total absence of case law.'") (citation omitted). Taking

Reid's allegations as true and construing them in the light most

favorable to him, the Court finds that he has not provided facts

sufficient to demonstrate that a constitutional violation occurred,

<u>and</u> certainly not that such a constitutional right was clearly

established at the time of Defendants' actions. Indeed, Reid fails

to cite to, and the Court independently identified no relevant

authority establishing that the failure to act on vague generalized

expressions of fear such as those Reid alleges would violate an inmate's constitutional rights, or that the prison's established procedures as described by Reid were constitutionally inadequate. As such, Defendants' motions to dismiss are due to be granted as to their claim of entitlement to qualified immunity as to the Eighth and Fourteenth Amendment claims.

## D. First Amendment Retaliation

Reid also asserts that Defendants violated his First Amendment right when they made "adverse decisions" to refuse to protect him. FAC at 18. Defendants do not address Reid's First Amendment retaliation claim in their motions to dismiss. The Prison Litigation Reform Act requires the Court to dismiss a case at any time if the Court determines that the action is frivolous, malicious, fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant who is immune from such relief. <u>See</u> 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). "The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." <u>Farrow v. West</u>, 320 F.3d 1235, 1248 (11th Cir. 2003). "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." <u>Smith v. Mosley</u>, 532 F.3d 1270, 1276 (11th Cir. 2008) (citing <u>Farrow</u>, 320 F.3d at 1248). An inmate may maintain a

cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were "the result of [the prisoner] having filed a grievance concerning the conditions of his imprisonment." Farrow, 320 F.3d at 1248 (quotation marks omitted).

As relevant to this action, the Eleventh Circuit set forth the standard applicable to a First Amendment retaliation case.

> To prove First Amendment retaliation, an inmate must show that: (1) his speech or act was constitutionally protected, (2) he suffered an adverse action from prison officials that would deter a person of ordinary firmness from engaging in the speech or act, and (3) the protected speech or act and adverse action were causally connected. Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); see Moton v. Cowart, 631 F.3d 1337, 1342 (11th Cir. 2011) ("An inmate must establish ... 'his speech or act was constitutionally protected....'"). We've routinely held that a prisoner's complaints about prison conditions, via administrative grievances, lawsuits, and the like are protected under the First Amendment. Smith, 532 F.3d at 1276 (addressing grievances about the conditions of imprisonment); Al-Amin v. Smith, 511 F.3d 1317, 1333–34 (11th Cir. 2008) (addressing a prison's opening of mail from attorneys outside the inmate's presence).

Hollins v. Samuals, 540 F. App'x 937, 938-39 (11th Cir. 2013) (per curiam). Notably, there must be a causal relationship between the retaliatory action (denying his requests for protective management housing) and the protected speech (filing grievances). Reid has not provided any facts, as opposed to conclusory assertions, sufficient to state a plausible claim under the First Amendment. Therefore, the Court will dismiss Reid's First Amendment claims

against Defendants Polk, Parrish, Willis, Barnes, Owens, and Collins for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii).

## E. Supervisory Liability

Defendants Willis, Barnes, and Owens assert that Reid's claims against them should be dismissed because, as supervisory officials, they are not liable under 42 U.S.C. § 1983. See Motion at 15-16; Barnes' Motion at 15-16; Owens' Motion at 16. Reid asserts that Defendants Willis and Barnes failed to protect him from known dangers, and that Owens, as an ICT member, made decisions that negatively affected his safety needs. The United States Court of Appeals for the Eleventh Circuit has stated:

> "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted).[9] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

> "The necessary causal connection can be established 'when a history of widespread

---

[9] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

abuse puts the responsible supervisor on
notice of the need to correct the alleged
deprivation, and he fails to do so.'" Cottone,
326 F.3d at 1360 (citation omitted).[10] "The
deprivations that constitute widespread abuse
sufficient to notify the supervising official
must be obvious, flagrant, rampant and of
continued duration, rather than isolated
occurrences." Brown, 906 F.2d at 671. A
plaintiff can also establish the necessary
causal connection by showing "facts which
support an inference that the supervisor
directed the subordinates to act unlawfully or
knew that the subordinates would act
unlawfully and failed to stop them from doing
so," Gonzalez, 325 F.3d at 1235, or that a
supervisor's "custom or policy . . . resulted
in deliberate indifference to constitutional
rights," Rivas v. Freeman, 940 F.2d 1491, 1495
(11th Cir. 1991).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008) (overruled on

other grounds as recognized by Randall, 610 F.3d at 709 (11th Cir.

2008) (rejecting the application of a heightened pleading standard

for § 1983 cases involving qualified immunity)); see Keith v.

DeKalb Cty., Ga., 749 F.3d 1034, 1047-48 (11th Cir. 2014). In sum,

To state a claim against a supervisory
defendant, the plaintiff must allege (1) the
supervisor's personal involvement in the
violation of his constitutional rights,[11] (2)
the existence of a custom or policy that
resulted in deliberate indifference to the

---

[10] Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

[11] See Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir.
2007) ("Causation, of course, can be shown by personal
participation in the constitutional violation.") (citation
omitted).

plaintiff's constitutional rights,[12] (3)
facts supporting an inference that the
supervisor directed the unlawful action or
knowingly failed to prevent it,[13] or (4) a
history of widespread abuse that put the
supervisor on notice of an alleged deprivation
that he then failed to correct. See id. at
1328-29 (listing factors in context of summary
judgment).[14] A supervisor cannot be held
liable under § 1983 for mere negligence in the
training or supervision of his employees.
Greason v. Kemp, 891 F.2d 829, 836-37 (11th
Cir. 1990).

Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam).

Viewing Reid's allegations in the light most favorable to him and
drawing reasonable inferences in his favor, the Court finds that
Reid has not alleged facts sufficient to show that Defendants
Willis, Barnes, and Owens were personally involved in, or otherwise
causally connected to, any alleged violations of his federal
statutory or constitutional rights. Indeed, the Court has concluded
that Reid's allegations are insufficient to state a plausible claim
of an Eighth or Fourteenth Amendment violation. Thus, Defendants'

---

[12] See Goebert, 510 F.3d at 1332 ("Our decisions establish that
supervisory liability for deliberate indifference based on the
implementation of a facially constitutional policy requires the
plaintiff to show that the defendant had actual or constructive
notice of a flagrant, persistent pattern of violations.").

[13] See Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008)
("Douglas's complaint alleges that his family informed Yates [(an
Assistant Warden)] of ongoing misconduct by Yates's subordinates
and Yates failed to stop the misconduct. These allegations allow a
reasonable inference that Yates knew that the subordinates would
continue to engage in unconstitutional misconduct but failed to
stop them from doing so.").

[14] West v. Tillman, 496 F.3d 1321 (11th Cir. 2007).

motions to dismiss are due to be granted as to Reid's supervisory claims against Willis, Barnes, and Owens.

## F. Declaratory and Injunctive Relief

As relief, Reid seeks a declaration that the Defendants' actions violated the Constitution and laws of the United States. See FAC at 22. Additionally, he requests that the Court direct Defendants Polk and Parrish to grant him permanent protective management status, and transfer him to a Y dormitory cell or bunk that is ADA compliant at CCI. See id. Defendants assert that Reid's requests for declaratory and injunctive relief are moot and/or without merit. See Motion 9-11; Barnes' Motion at 9-11; Owens' Motion at 10-11.

According to the FDOC Offender Network, Reid is no longer housed at CCI. See http://www.dc.state.fl.us/offenderSearch. The general rule in this circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief. Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir. 1986) (per curiam). The rationale underlying this rule is that injunctive relief is "a prospective remedy, intended to prevent future injuries," Adler v. Duval Cty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997), and, as a result, once the prisoner has been released or transferred, the court lacks the ability to grant injunctive relief and correct the conditions of which the prisoner complained. See Wahl v. McIver, 773 F.2d 1169,

1173 (11th Cir. 1985) (per curiam) (stating that a prisoner's past exposure to sub-par conditions in a prison "does not constitute a present case or controversy involving injunctive relief if unaccompanied by any continuing, present adverse effects"). Therefore, Reid's claims for declaratory and injunctive relief relating to any sub-par conditions and procedures at CCI fail to present a case or controversy since he is now incarcerated at another FDOC penal institution. As such, even if Reid alleged a plausible constitutional violation, Defendants' motions to dismiss would be due to be granted to the extent that they seek dismissal of Reid's claims for declaratory and injunctive relief.

## G. Defendant Collins

The Court has not served Defendant Collins. Nevertheless, upon review and for the reasons previously stated as to the other Defendants, the Court finds that Reid has not alleged facts sufficient to state plausible claims under the First, Eighth, and Fourteenth Amendments as to Collins. Therefore, the Court will dismiss Reid's First, Eighth, and Fourteenth Amendment claims against Defendant Collins for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii).

Therefore, it is now

**ORDERED**:

1.    Defendants Polk, Parrish, and Willis' Motion to Dismiss (Doc. 45), Defendant Barnes' Motion to Dismiss (Doc. 58), and Defendant Owens' Motion to Dismiss (Doc. 70) are **GRANTED**.

2.    Reid's First, Eighth and Fourteenth Amendment claims against Defendant Collins and First Amendment claims against Defendants Polk, Parrish, Willis, Barnes, and Owens are **DISMISSED** for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii).

3.    The case is **DISMISSED,** and the Clerk shall enter judgment dismissing the case.

4.    The Clerk shall terminate all pending motions and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of March, 2018.

*Marcia Morales Howard*
**MARCIA MORALES HOWARD**
United States District Judge

sc 3/20
c:
Clifford Leon Reid, FDOC #111123
Counsel of Record